# Stuck *against* Mackey.

Land devised to executors to be sold and the proceeds to be divided amongst the legatees, is not the subject of a lien or execution against the legatees, but they may elect to take the land instead of the proceeds of the sale of it, and after such election it becomes the subject of lien, and may be sold upon a judgment and execution against the legatee.

ERROR to the Special Court of Common Pleas of *Fayette* county.

This was an action of ejectment for a tract of land by James Mackey and others against Stephen Stuck, William Crawford, and Bazil Brownfield.

GRIER, President, before whom the cause was tried, thus stated the facts of the case, and determined the law of it.

The land in dispute is part of a tract of land late the property of Stephen Mackey, sen'r, who died in March 1819, having by his last will and testament, directed his executors to sell the land one year after his death, and divide the proceeds among his four children, viz: one-half to his son Stephen, the other half to his three daughters.   Instead of the money, Stephen took one-half of the land.   In October 1820, he became bound in a recognizance for $10,000, as the bail for Daniel P. Lynch, sheriff.   On this recognizance a judgment was obtained in October 1823, and this tract of land was levied on as the property of Stephen Mackey, and in March 1826 sold to John Dawson, Esq. for $5; and in February 1830, Dawson sold to plaintiffs for $100.

The validity of the plaintiffs' title will of course depend on the fact whether this recognizance or the judgment thereon was a lien on this land.   Where a testator orders his executor to sell his land and divide the proceeds equally among his children, it is well

[Stuck v. Mackey.]

settled that the children have no estate in the land which is the subject of lien or execution. *Morrow* v. *Brenizer,* (2 *Rawle* 185).

It is also as well settled that when the proceeds of real estate are devised, the person beneficially interested may elect to take the fund as real estate. He may take it either as land or money. *Burr* v. *Sim,* (1 *Whart.* 252); *Smith* v. *Starr,* (3 *Whart.* 65). The settlement of this estate seems to have been done in a careless manner. They have left the arrangement, (if any such was made), by which the devisees agreed to take their shares in land, to rest in parol. This will leave the first and most important point in the case, as a matter of fact, depending on the testimony of witnesses, and of course to be decided by the jury. For if Stephen Mackey the devisee had with the consent of the executors and his co-devisees, entered upon this land, and taken it in lieu of the money devised to him, before the date of recognizance, it follows as a matter of course, that this recognizance became a lien upon the land, and the sale by the sheriff to John Dawson, conferred a title. But if you do not believe the testimony on this subject; if Stephen Mackey obtained no title to the land till October 1824, when the executors put on record a deed to him for the whole land, then the title of plaintiff is worthless; and you need not proceed further in the investigation, but find a verdict for defendant. But if you believe these witnesses, Abraham Brown, Christopher Brown, and Ann Leckner, can this matter of election be completely proved by parol? I have no doubt it may. The election, as such, may be proved as any other matter *in pais,* and if the proof that the devisees agreed to take the land, and immediately went into possession each of their portion, and have held it without hindrance for 21 years, is clear, satisfactory and uncontradicted, I see no reason why each should not be treated as having a title to the land, as such, from the date of such agreement and entry.

Assuming, then, that credit is to be given to this testimony, what does it prove? It would appear that in April 1820, the executors, according to the requisition of the will, advertised the premises for sale: that on the first day of sale the property was bid up to a sum exceeding $5000, (what was considered its value): that the sale was then adjourned to another day, to be held at the court-house: that in the mean time, the devisees present and executors came to this arrangement—that the devisees would take the land among themselves, and divide it in the proportions given by the will, and if the sister, (Rebecca), who lived in Ohio, should prefer to have money instead of her share in land, that Christopher Brown, who was husband of one of the devisees, would take her share, and pay her the money at the rate to which the whole had been bid at the sale. To this arrangement the executors assented, and the sale was stopped. Soon after, the other sister from Ohio came in, assented to the arrangement, the devisees divided the land among themselves, and have held possession accordingly from

IV. — R *

[Stuck v. Mackey.]

that day to this, upwards of 21 years. Christopher Brown went on to make payments to his sister, and to the executors on account of her interest. He afterwards makes sale of his land to Judge Ewing, and binds him to pay the executors the balance due. Mr Ewing pays the whole amount to the executors in pursuance of his agreement. There is nothing to contradict the whole of this testimony, except a recital in a deed by the executors; but, on the contrary, besides the acknowledgment of the executors in their deed to Mr Ewing, that he paid the money for Christopher Brown, we have the several receipts of each of the executors, fully corroborating the parol testimony, that there was no sale of the property to Stephen, but that each took his share in land, and that Christopher Brown had purchased the share of Rebecca.

2. The defendants claim title to the land, 1st, under a sheriff's sale of this land in 1836 to Judge Ewing, founded on a judgment obtained by Basil Brownfield, (the defendant in this case), against Stephen Mackey. It is plain that if the recognizance was a lien, and the sale to John Dawson, (under whom the plaintiffs claim), was valid, Stephen Mackey had no title, and therefore the second sale was a nullity. And if even the second purchaser at sheriff's sale could be said under any circumstances to be a purchaser without notice of the first sale by the sheriff, there is proof, (without contradiction), that Mr Austin, the attorney for plaintiffs, gave actual notice of the plaintiff's claim at the last sale; and the fact that one of the plaintiffs was present, drunk, and offering to bid, at the sale, raises no equity in favour of the purchaser.

3. But this last sheriff's sale was founded on another transaction in which Henry Beeson, the executor, became a purchaser of the whole tract, and held this land, as he alleged, in trust for Stephen Mackey. The history of that transaction, as given in evidence, is briefly as follows:—In the year 1824, Rebecca Jamison, the devisee, who resided in Ohio, employed Messrs Dawson and Stewart her attorneys to collect from the executors the balance due to her out of the estate of her father. Her attorneys brought suit against the executors. They, instead of pursuing Christopher Brown, to whom they had agreed to sell the interest of Rebecca, and from whom they had received a considerable portion of the purchase money, proceeded in a manner most extraordinary, the motives for which have not been explained, but may be guessed at from certain circumstances in evidence. They made a deed to Stephen Mackey for the whole 180 acres, including as well his own share as that taken by the other heirs, and put it on record, reciting a sale of the premises to him in 1820, and immediately commenced a suit against him for the whole purchase money. The counsel, who it appears did not wish to be held responsible for the correctness or propriety of these proceedings, took a special power of attorney from the executors and filed it of record, showing the purpose of the suit. A judgment was entered against Stephen

[Stuck v. Mackey.]

Mackey for the whole amount of the purchase money, although, as Mr Dawson the attorney swears, Mackey did not consider himself liable for a dollar of the money, and that he, (Dawson), put this power of attorney on record to show the object of the suit, and that Mackey might not be wronged, who was hardly fit to take care of himself. On this judgment an execution was issued, and Henry Beeson the executor bid in the property, telling others they need not bid, as he was acting as trustee for the heirs. If you believe the testimony of Brown, at the very time the executors were going through this absurd farce of selling the land of Stephen Mackey to pay the debt of Christopher Brown, and buying in the land as trustee for Mackeys, Christopher Brown stood ready and willing to pay all the money due to Rebecca Jamison, and tendered it to the executor, who obstinately persisted in this absurd conduct. Was it to get clear of accounting for the payments made by Christopher Brown on account of his contract to one of the executors, who was now become insolvent, that this course was pursued? Or was it because Stephen Mackey's property was about to be swept off for the payment of his debt as bail for sheriff Lynch, that this form of proceeding was thus pursued and persisted in to cover his property from the pursuit of his creditors? Such has certainly been the effect, if not the intention of these proceedings; for we see that in consequence of this cloud cast upon his title by this deed and judgment of 1824, his land was sold for the sum of $5. Let the motive for this conduct be what it may, if you believe the evidence already stated with regard to the whole transaction, this sale was a nullity, and conferred no title whatever on the executor Henry Beeson.

4. But it has been contended, that because Mr Dawson, the purchaser at the first sale, was attorney for Beeson in this last sale, therefore Beeson got a good title. I am wholly unable to see the connection between the premises and the conclusion. Mr Dawson's title was on record; he practised no deceit on Beeson. He did not advise Beeson to this absurd course. Beeson did not pretend he was going through this form to take Mackey's land from him, but only to obtain the means of coercing somehow or other the payment of the money due by Christopher Brown, who was standing ready and offering to pay the money without coercion, and did afterwards pay it, by Judge Ewing his agent.

5. Judge Ewing also, who purchased or rather took a deed from the executors and heirs of Beeson, had full knowledge of the nature of the whole transaction, as fully appears on the face of his own title, insomuch that the recitals of his deed make it a perfect *felo de se.* For he first purchased from Christopher Brown by an article which recited the sale of Rebecca's interest to him, his agreement to pay the money to the executors, and binds Mr Ewing to pay the balance of the money, which he accordingly did; and the

deed from the executors to himself honestly recites the whole transaction, and carefully demonstrates itself to be a nullity.

6. Nor does Basil Brownfield stand in the situation of a purchaser without notice, for a valuable consideration. 1. Because he has not paid his purchase money, or got his deed. 2. Because plaintiff's title is on record. 3. The recitals of his own title give him information of its nullity.

7. Nor does the fact that the plaintiffs permitted their father to live on the property, and rent it, and reserve the rents during his life, affect their title. It was a fraud on no one; it was no wrong to the creditors of the father, who was poor and insolvent, and might live though he could not pay his debts. The plaintiff's title was no secret trust or equity; no one was misled by their filial kindness to suppose their father was wealthy and give him credit. When he died they claimed the rents, and have more right to complain of the wrongful manner in which they were turned out of possession under the forms of law, than the creditors have to blame them because they paid but an inadequate price. That Mr Dawson gave them his title for a trifle is honourable in him, but wrongful to no one. That he bought it fairly at public sale is not denied. If the property was sacrificed it was the fault of others, and not his. If he got a good title when he supposed it doubtful or bad, it is his good fortune. His own opinion of it then or now cannot make it good or bad.

Finally, if the jury believe the testimony of the plaintiffs, I see nothing in the evidence given by defendants, or in the legal points urged by them as a defence, which should hinder you from giving a verdict for the plaintiffs.

Every part of the charge of the court was assigned for error

*Howell* and *Deford*, for plaintiffs in error.

*Veech* and *Dawson*, for defendants in error.

PER CURIAM.—The principles of law involved in this case have been so fully stated by the President of the District Court, and so accurately applied to the circumstances, that it is necessary to say no more than that no part of the assignment of errors has been sustained.

Judgment affirmed.