John A. Rigg, Appellant, v. Adam Schweitzer et al.,
Executor of William Schweitzer, Deceased.

*Executors and administrators—Purchase by executor at his own sale.*

An executor or administrator may purchase property of the estate at
his own sale subject to the power of disaffirmance in the heirs or creditors,
and if he bids upon it through an agent in good faith with the purpose of
purchasing the property himself, under the published conditions of the
sale, there is nothing in his having done so of which other bidders have a
right to complain, or which furnishes ground for setting aside the sale of
the property to another bidder.

*Evidence—Fraud—Bid by executor at his own sale.*

On a bill in equity to set aside an executor's sale, on the ground that
the executor had secretly bid upon the property through an agent, evi-
dence as to the amount the executor intended to bid upon the property,
and as to the reasons for his refusal to buy the property after the sale for
the sum which he bid upon it, is immaterial, where it appears that the
executor bid at the sale in good faith and with the intention to purchase
the property for himself.

Argued March 8, 1895. Appeal, No. 367, Jan. T., 1895, by
plaintiff, from decree of C. P. Berks Co., No. 603 Equity Docket,
1894, dismissing bill in equity. Before WILLIAMS, McCOLLUM,
MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity to declare void a executor's sale.

The case was tried before ERMENTROUT, P. J.

Plaintiff's contention was that the sale was void, inasmuch
as Solomon Schweitzer, one of the executors, had bid at the
sale, through his agent Lewis Moyer. Solomon Schweitzer was
called by plaintiff, as if for cross-examination, and was asked:

" Q. How high had you made up your mind you would go
for the property?

Mr. Jacobs: " Objected to as immaterial and irrelevant. It
is impossible for a man to tell how far at a public sale he in-
tended to go for the property or would not. He would be
governed most likely by other bidders.

The Court: " For the present we will sustain that objection.
It is simply an unexpressed idea. Exception for plaintiff." [21]

" Q. If your limit was $20,000 until you had made that bar-

gain or arrangement with your brother and sisters, and if in consequence of that arrangement you bid $217 an acre, and really wanted the property, why didn't you take it from Mr. Rigg at $217 on the following Monday ? "

Mr. Jacobs : " Objected to as entirely immaterial, irrelevant, and inadmissible at this time."

The Court : " The objection we will sustain. Exception for plaintiff." [22]

" Q. State as to whether or not, at the time that you signed that agreement, you believed the representations that were made to you in regard to the bidders having been bona fide were correct."

" Objected to."

The Court : " For the present we will sustain this objection. Exception for plaintiff." [23]

When Albert J. Brumbach, a witness for defendant, was on the stand he was asked the question :

" Q. Could a man having bought that property, a man reasonably capable as a farmer, and a reasonably good manager—could he have bought that property and paid $217 an acre for the one tract, and $108 for the other tract, and have made any return on his investment ? "

" Objected to as immaterial and inadmissible. Further, that it has not been proven that the farm was not bought for farm purposes."

The Court : " Objection sustained. Exception for plaintiff." [24]

Mr. Derr : " The plaintiff in his bill alleging fraud, and the fraud being secret, and the law allowing the largest latitude of testimony in the establishment of it, and the defendants, especially the one defendant, Solomon Schweitzer, alleging that these bids were made for himself and that he intended to purchase the property in good faith at the rate of $217 per acre as to the first tract, and then had his highest bid as to the second tract; it is proposed to show that the said price was bid by Lewis Moyer, who is alleged to have been bidding for Solomon Schweitzer, is so utterly disproportionate to the value of the farm in question and so utterly disproportionate as to the price at which land of this sort could be purchased, and any return made upon the investment, as to render the allegation of the

defendant that he was buying in good faith improbable; this for the purpose of aiding plaintiff's allegation of fraud."

Mr. Jacobs: "Objected to for the reasons already mentioned."

The Court: "Objection sustained. Bill for plaintiff." [25]

ERMENTROUT, J., filed the following findings of fact and conclusions of law:

"1. That William Schweitzer, late of the township of Exeter, in the county of Berks, died, leaving a last will and testament, wherein he appointed Adam Schweitzer, Solomon Schweitzer, and Wilson Schweitzer, the defendants in this bill, executors, and wherein he devised the property whereon he, the said testator, resided, and herein more fully described, to his wife, Sarah, for her life, and after the death of his said wife directed his executors to sell the same at public sale, for that purpose empowering them to execute and deliver good and sufficient deeds to the purchaser thereof. The proceeds thereof he bequeathed as follows: To his son Adam the sum of $1,000; to his son Solomon, $500; and the balance he gave and bequeathed unto the said Adam and Solomon (his sons and two of the executors), and his daughters Sophia Kessler, Ellen Body, and Sarah Reider, in equal shares, to them, their heirs and assigns forever.

"2. His wife, Sarah, having died, his said executors, pursuant to the provisions of the said will, advertised the said property consisting of two tracts, that is to say, No. 1, all that certain messuage, tenement, plantation, tract, or piece of land situate in the township of Exeter, county aforesaid, about one half mile from the Black Bear Inn, and the same distance from Dengler's, adjoining lands of the estate of James Koch, deceased, John G. Fisher, Samuel Kutz, Samuel Hoffmaster, John Kachel, and others, containing 145 acres and 123 perches, more or less; No. 2, all that certain tract of arable timber land adjoining tract No. 1 above described, property of Samuel Hoffmaster, Jacob Levan and Isaac Levan, containing 9 acres and 150 perches, more or less, to be sold at public sale at the public house known as the 'Berks County House,' in the city of Reading aforesaid, on the 6th day of October, 1894.

"3. The plaintiff is president of the Reading Traction Company, a corporation controlling by lease a number of street rail-

ways in and about the city of Reading aforesaid; that some of
the stockholders of the said company recommended the pur-
chase of the property aforesaid, with a view to converting such
part of it as was suitable therefor (being about 30 acres), into
a summer park, to be held and maintained by a corporation to
be created for that purpose, as a means of stimulating and
increasing the travel over the railway system of the Reading
Traction Company, the Stony Creek Branch of which system,
extending a number of miles into the country, passes the said
property, and intending to dispose of the remaining 125 acres
of the said farm, including the farm buildings.

"4. The plaintiff thereupon endeavored to secure the said
property for the purpose aforesaid and requested one Abraham
Schweitzer, who was himself in no way personally interested
in the said property, but was familiar therewith, to specially
examine and give to the plaintiff his opinion as to the market
value of the farm. After making such examination, making
no inquiries in the neighborhood and using his own judgment,
he reported to the plaintiff that he had been down to the farm,
that $75.00 per acre was a fair price for it as farm land, but it
might bring $100; whereupon the plaintiff told him that he
wanted the farm and wanted him, Schweitzer, to buy it for him.
No limit as to price was fixed, but he was instructed to buy the
farm and that he should be the last bidder.

"5. In accordance with these instructions, Abraham Schweit-
zer attended the sale—the plaintiff not attending personally
—there being present all the executors, their attorney and a
large number of persons; that property No. 1 was first exposed
to sale, and the said Abraham Schweitzer bid upon it; [there
were other bidders,] [2] the bidding was very spirited and the
property was finally struck down to him, the said Abraham
Schweitzer, for $217 per acre, amounting in the aggregate to
$31,704.70. Property No. 2 was then exposed to sale, was bid
upon and purchased by the said Abraham Schweitzer for the sum
of $108.25 per acre, amounting in the aggregate to $1,075.73,
the sum total of both bids being $32,780.45. Although at the
time Abraham Schweitzer went there, he thought that $125 or
$130 would be a very full price for it, he had no opportunity
to consult Mr. Rigg, and did not stop bidding for the follow-
ing reason given by himself, to wit: 'I did not stop bidding

because I did not think it would be doing what I was instructed to do if I would stop bidding. I was instructed to buy the farm, and if I would have stopped I would not have been the last bidder, and I would not have followed the instructions.'

"6. That on the same day shortly after the sale, Abraham Schweitzer informed the executors of the name of the party for whom he was buying, and thereupon went to the office of the plaintiff, the Reading Transaction Company's office, for the purpose of having the agreement of sale signed. Upon Mr. Rigg being informed of the price bid for the property, he and his attorney expressed surprise at the amount of the bid, Mr. Rigg's attorney designating it as enormous, and inquired whether it was a fair sale ; that the executors and their attorney assured them that it was, that there were several bidders, and upon their assurance of this having been a fair sale, the plaintiff, by advice of his attorney, executed articles of agreement embracing the conditions of sale, and gave to the said executors the 10 per cent down money called for by the conditions of sale in the shape of a check for $3,278.22, upon the National Union Bank of Reading, dated October 6, 1894.

"7. That by the said conditions and articles of agreement, it is provided not only that the purchaser shall immediately after the sale pay to the seller a deposit of 10 per cent on account of the purchase money as aforesaid, and that he, the purchaser, shall sign an agreement for the payment of the remainder of the purchase money on or before April 1, 1895, but also, that upon the failure by the purchaser to comply with the said and other conditions of the sale, the 10 per cent so deposited shall, at the expiration of the time above limited, become forfeited to the vendors, who shall be at full liberty with or without notice to resell the property, and if, on such resale, there shall be any deficiency, the purchaser so neglecting to comply with the said conditions shall make good the same to the vendors and all expense attending such resale. One of the conditions of the sale published, read and announced thereat, and incorporated in the articles of agreement signed by the plaintiff, was, that the highest bidder should be the purchaser. If on April 1, 1895, the balance of purchase-money was not paid, the purchaser should pay interest thereon to day of payment without prejudice to vendor's right to insist upon performance of the conditions.

" 8. On Monday, October 8, 1894, having for the first time learned that Louis Moyer, a bidder at said sale, had been employed by Solomon Schweitzer, one of said executors and son of William Schweitzer, deceased, to bid at said sale, and alleging that his employment was a fraud upon bona fide bidders, and that the acts and conduct of the executors and parties interested were of such a character as to avoid the sale, the plaintiff notified the executors of his intention to avoid the sale, and stopped the payment on the check aforesaid. Thereupon on the 17th day of October, 1894, to No. 53 November term of that year, the executors, defendants, brought a suit against the plaintiff on the check given on account of the purchase-money, and filed a statement therein; that upon the filing of an affidavit of defense by the plaintiff, the said executors entered a determination to choose arbitrators and only stopped proceedings therein when the injunction was issued upon this bill restraining them, as well from reselling the said property and seeking to hold the plaintiff for the deficiency, pursuant to the conditions of sale above recited, as from further proceeding in the suit upon the said check.

" 9. At and previous to the sale, Edwin Sassaman, Esq., was the attorney for Solomon Schweitzer and his coexecutors. When they met to arrange for the sale of this property, Solomon expressed a desire to have the property. Adam, his coexecutor, said it had always been understood that Solomon was to have the property if he could get it. Subsequently, Solomon consulted Mr. Sassaman as to what arrangements could be made about getting the money to buy the farm, stating that, from conversations with parties in the neighborhood, he thought it would bring about $20,000. His attorney saw parties in Philadelphia who promised to raise from 40 to 60 per cent of the price on first mortgage, and Solomon was thereupon informed of this fact previous to the sale. All of the executors were informed and understood that an executor had no right to bid himself at the sale; that thereupon Solomon Schweitzer engaged Louis Moyer to bid for him, and his bidding was to be regulated by Mr. Sassaman, the attorney. The instructions to Mr. Moyer were to bid until he was told to stop. Mr. Moyer appeared at the sale. When tract No. 1 was bid up to $167, Solomon, the executor, requested the attorney, Mr. Sassaman,

to stop the auctioneer until the matter could be talked over with his sisters. He had previously considered $150 per acre as the highest limit to which he would go in his bids, although he never informed his coexecutors or sisters or Louis Moyer of this fact. He instructed Mr. Sassaman that it was nearly high enough for him. In the presence of the coexecutors and sisters the matters were talked over. Solomon desired to have the property, and the sisters were willing that he should have it. The three sisters agreed that he should go ahead, that they would leave their money remain in the place if he bought the farm. Adam Schweitzer also agreed to help him, without mentioning to what extent. Neither the terms nor conditions nor the time for which the sisters would permit their money to remain in the farm were spoken of, suggested or agreed upon. Thereupon Solomon Schweitzer instructed Mr. Sassaman to tell Moyer to go slow, and the bidding proceeded. When the bid reached $205 per acre, Solomon requested Mr. Sassaman to stop Mr. Moyer from bidding for him, but Mr. Sassaman could not get through the crowd to where Moyer was standing—the bidding being spirited and the crowd large—and when Mr. Sassaman succeeded in reaching Mr. Moyer, Moyer's bid was $217. Abraham Schweitzer bid $217.50, and there being no other bidding the property was struck down to him. Louis Moyer was also a bidder on tract No. 2, and this also was knocked down to Abraham Schweitzer for $108.25 per acre, amounting in the aggregate to $1,075.73. None of the sisters or the coexecutors knew of the amounts of Moyer's bids or how much Solomon desired to have bid for the property. Nor did any of the executors, or Solomon or the sisters, know that Abraham Schweitzer was bidding for Mr. Rigg or the Traction Company. The coexecutors knew that Moyer was bidding for Solomon. [The executors and heirs knew that Solomon was anxious to have the place and was endeavoring to obtain it. Moyer was employed by Solomon alone; none of the other executors authorized any one to bid or puff the sale, and Solomon employed Moyer to bid and buy the place for him, and not with any intent to puff or enhance the price of the property against bidders.] [3] [All the bids made by Louis Moyer were made at the request of Solomon with the bona fide intention on the part of Solomon, through Louis Moyer, to buy the

property. Louis Moyer made all his bids bona fide and not with the intention of enhancing the price.] [4] [None of the sisters did any bidding nor authorized any one to bid for them, or any to bid for the purpose of puffing or enhancing the price,] [5] nor did they desire to become purchasers of the property.

" [10. The promise of the sisters to leave their money stand in the place, and the promise of the brother to help Solomon, made in the presence of the executors, did not give Solomon any advantage over other bidders. He was not released from the necessity of signing the conditions and agreement of sale and complying with them in the manner and form as therein stated.] [6]

"11. At the time of the sale Solomon Schweitzer had invested $1,200 in the hands of his sisters ; $300 on interest in another quarter; he owned a house and lot in Mohnsville worth $800, woodland in Brecknock township worth $2,000, and owned farm stock, he being a farmer, worth about $1,650, making a total of $5,950. That the value of William Schweitzer's estate outside of the two tracts sold was about $2.300. Solomon's interest in this estate was a special legacy of $500, and the one fifth interest with the rest of the heirs, after the deduction of the special legacy of $1,000, special legacy to Adam, and expense of settling the estate. His share of the proceeds of said William Schweitzer's estate, on the basis of this sale, would be $7,000.

" [12. The sale made was a fair and bona fide sale, without any fraud on the part of the defendants or any one of them. There is no fraud, actual or legal, in the sale or in the conduct of the defendants in relation thereto.] [7] The plaintiff is not entitled to the equitable relief asked for.

" I make the following

### FINDINGS OF LAW.

"1. The employment of puffers by owners to bid up property selling at auction with the view to raise the price on bona fide bidders, is a fraud upon them, and will avoid the sale at the option of the purchaser.

"2. Where an owner of property advertises it for sale at public auction and offers it upon the condition that the highest

bidder shall be the purchaser, any secret bid made by such owner will, at the option of the purchaser, invalidate the sale.

" 3. A secret arrangement between the seller at an auction sale and one of the bidders, giving to the latter advantages not provided in the conditions and not given to the purchasing bidder, renders the sale void at the option of one who bids in ignorance of such arrangement, but the advantages must be of such a character as to substantially change the contract or terms of the conditions of sale.

" [4. The employment of a third person fairly to bid for a trustee is not, in itself, destructive of the sale. None but the cestui que trust can object thereto. One of three executors may authorize a third person to bid in good faith for him, subject to the power of disaffirmance in the heirs or executors. Other bidders have no right to disaffirm his acts.] [14] His bids made in good faith, without any intention to puff or enhance the price, are not a fraud upon other bidders. The fact that he is interested as a distributee, heir or legatee, in the funds realized at such sale does not invalidate this principle.

" [There is nothing in the evidence that would indicate that Lewis Moyer was employed by the executor, Solomon Schweitzer, to bid as a puffer.] [15] If he had been a puffer and acting as such, it would certainly have avoided the sale at the option of the purchaser. A puffer is a person employed by an owner of property which is sold at auction to bid it up, and who does so accordingly for the purpose of raising the price upon bona fide bidders. Bouvier's Dict., vol. 2, 394, or as is pithily set forth in Doolubdass v. Ramloll, 3 Law and Eq. Rep. 39–47, ' a puffer is not a real bidder ; by an arrangement between him and the vendor his bid is to go for nothing ; but as to the competing bidders, it appears to be what it is not, a real bidding, and the vendor by authorizing it is guilty of a fraud on them, and cannot profit by it.' [The sale is, therefore, not voidable for the employment of a puffer ; Moyer was employed not to enhance the price by bidding against others, but to bid and buy bona fide.] [16]

" The sale was held by authority given under the will of the late William Schweitzer. This will directed that upon the death of Sarah, his wife, to whom the property had been given for life, his executors should sell the same at public sale, for

that purpose empowering them to execute and deliver suitable deeds to the purchaser thereof. Both the handbills and the conditions of sale set forth that they were selling as such executors. The defendants, with the exception of Wilson, an executor (who is a stranger), were interested in the distribution of the proceeds of the sale.

"It appears by numerous authorities that a trustee, administrator or executor can sell, and, through a third party, can bid and buy at his own sale ; that whilst such action is discountenanced, yet the sale can only be called in question by the cestui que trust and creditors, and not by third parties.

"Controlled, as we must be, by authorities, we must necessarily hold that the sale is not void, no fraud was practiced upon other bona fide purchasers, because of the executor employing Louis Moyer to bid and buy for him. Only the children and creditors could complain. The bids made through him were in good faith and there was no room to say, therefore, he was not a bona fide bidder. . . .

"It is to be observed in all the authorities upon this subject that there was either a puffer employed by the owner, or the owner acted as puffer himself, or instructed the auctioneer not to let the property go under a certain fixed price. This latter instruction was held to be equivalent to a direction to puff up the sale to such price, and therefore to avoid the sale. One cannot conceive of an individual owner bidding at his own sale secretly, there being no necessity for buying in his own property. Such action on his part necessarily and at once sets the seal to the imputation of fraud. The reservation of an open bid may be necessary to prevent a sacrifice, but the bid being open, no one can be deceived or defrauded. It would be in the interest of sound public policy were the law declared to be that no trustee, executor or administrator should be permitted to bid at any sale held by him unless the right to bid appears definitely in the conditions of sale. It would effectually remove temptation and banish the suspicion of fraud. But I do not find the authorities go to this extent.

"It is urged that, because Solomon Schweitzer is entitled under the will to a certain interest in the proceeds of the sale upon distribution, therefore he is an owner and disqualified from bidding or authorizing any one to bid. That an interest

in the distribution, coupled with the office of executor, is not a bar to honest bidding seems settled by Pennock's Appeal, 14 Pa. 446, where the widow, interested by law in the proceeds of sale, acting as administrator, employed an heir, her coexecutor, to bid for her. It does not appear that any right to bid was reserved. A fair inference from the report of this case would indicate that the purchaser who was bidding against her agent sought to have the sale set aside on the ground that her bids were spurious, puffing bids. The objections availed nothing and the sale was confirmed.

" I have affirmed the third finding of law above stated and presented by plaintiff, with reference to secret arrangements, with a qualification as to the required character of such arrangements. The principle, however, is not applicable to this case. [The arrangement made between Solomon Schweitzer and the heirs was not a change of the conditions of sale in any way, or one forbidden by law.] [17] . . . .

" Here there are no representations as to property, title, quantity, quality or extent not known to all or inducing anybody to bid more for the property. The conditions are publicly read, placing every one upon an equality. [There is no agreement to release from the conditions, no offer to dispense with a single one of them, or anything said or done that would release him from a compliance therewith. In law, notwithstanding what was said and done, his executors could have enforced the conditions.] [18]

" [It is true the purchaser says he was not prepared in cash to pay 10% down. He says he could have gotten together $2,000, and that his brother and sisters would have helped him. One of the executors says he had no doubt they would have accepted his note. We are unwilling to hold as a proposition of law that Solomon was absolutely required to be prepared to pay 10% of the purchase money down in cash, and that the executors could not have taken the duebill or note of one entitled to receive an amount equal to twice the down money. We are also unwilling to hold that it must be shown that he was, at the time of the sale, prepared to raise the balance of the purchase money. The conditions of sale did not require this, but at option of executors, time of payment could be extended after April 1, 1895.] [19]

" [As we have seen in the eleventh finding of fact, he had resources to the amount of $5,950. He had his own interest in the proceeds of the estate amounting to $7,000. His three sisters were willing to loan him theirs, and his brother was also willing to help him. With these resources he was certainly able to pay for the property. We see no difference between raising the money in this way and borrowing it upon a bond and mortgage. We see no such advantage given as would relieve the purchaser.] " [20]

After citing Chronister v. Bushey, 7 W. & S. 152; Beeson v. Beeson, 9 Pa. 279; Campbell v. Walker, 5 Ves. 678; Hannum's App., 2 Penny. 106; Pennock's App., 14 Pa. 446; Miller's App., 1 W. N. C. 242; Veazie v. Williams, 8 How. (U. S.) 134; Bexwell v. Christie, Cowp. 396; Steele v. Ellmaker, 11 S. & R. 86; Wheeler v. Collier, 1 Moody & Watkins, 123; Towle v. Leevit, 23 N. H. 360; Yerkes v. Wilson, 81* Pa. 9; Staines v. Shore, 16 Pa. 200; Hopkins v. Tanqueray, 80 Eng. Com. Law, 129, the court entered a decree dismissing the bill. Plaintiff appealed.

*Errors assigned,* among others, were (21–25) rulings on evidence, quoting the bill of exceptions; (2–7, 14–20) portions of the findings of the court, as above, quoting them; (27) decree, dismissing bill.

*Cyrus G. Derr, Ermentrout & Ruhl* with him, for appellant. —The charge of fraud made in the plaintiff's bill is clearly made out, and upon the testimony of the defendants alone the secret bids of the agent employed by one of the vendors and owners, with the knowledge and consent of the remaining vendors, must be regarded as the bids of the owners of the property, and therefore as sham bids and as constituting a fraud rendering the sale void at the option of the plaintiff : How v. Weldon, 2 Vesey, Sr. 516; Hamet v. Dundass, 4 Pa. 178; Davidson v. Little, 22 Pa. 245; Yerkes v. Wilson, 81* Pa. 9; Pennock's App., 14 Pa. 446; Staines v. Shore, 16 Pa. 200; Bexwell v. Christie, Cowper, 395; Steele v. Ellmaker, 11 S. & R. 86.

If the arrangement between the owners of the property in question alleged to have been made at the sale is to be regarded as fair and honest, and not as one to authorize sham bidding,

then the said arrangement constituted a varying of the condition of the sale in favor of one bidder (Solomon) to the disadvantage of another (the appellant), the bidder did not stand upon an equal footing and the sale is void at the option of the appellant: Hopkins v. Tanqueray, 80 Eng. Com. Law, 130; Bexwell v. Christie, Cowper, 395.

The plaintiff and his agent having upon sufficient ground concluded that the property was not worth and would not bring more than $100 per acre, and the plaintiff upon such assumption having instructed his agent to attend the sale and be the last bidder, the circumstances in which the agent was placed— his principal being absent so that he could not confer with him— the property at the first attempt to sell hanging upon his bid of $60.00 and upon the second offer of it suddenly going up to $168 per acre and beyond, together with the secret machinery set in motion by the defendants, constituted the elements of that surprise which is recognized by courts of equity as sufficient to avoid a contract: Evans v. Llewellin, 1 Cox's Cases in Chancery, 340; 13 Story's Eq. Jur. sec. 120, p. 2; Twells v. Conrad, 2 W. N. C. 30.

The rulings of the learned judge of the court below refusing to permit the appellant upon cross-examination to ask Solomon Schweitzer questions, and refusing to permit appellant to show circumstances tending to prove fraud, were erroneous.

*J. H. Jacobs, H. P. Keiser, Edwin Sassaman* and *Aug. S. Sassaman* with him, for appellees.—An overestimate by a vendor of the value of an article which he sells does not create a cause of action against him, nor is it a defense to a suit for the price agreed to be paid: Byrne v. Stewart, 124 Pa. 450.

Parties are not permitted to testify their unexpressed intent, motive or belief at the time they signed the contract. The thoughts of one party cannot be proven to bind the other: Spencer v. Colt, 89 Pa. 314; Juniata B. & L. Assn. v. Hetzel, 103 Pa. 507; Thomas & Sons v. Loose, Seaman & Co., 114 Pa. 35.

OPINION BY MR. JUSTICE McCOLLUM, October 7, 1895:

Solomon Schweitzer desired to purchase the property, to the sale of which this contention relates, and all the parties bene-

ficially interested in it were willing he should. He employed Louis Moyer to bid for him, but as he was outbidden the property was sold to the plaintiff, who gave his check for the hand money and executed articles of agreement embracing and in accordance with the other conditions of the sale. The employment of and the bidding by Moyer were bona fide and for the single purpose of securing the property for his principal. He was not a puffer engaged by the vendors to force up the price against the public, and there was no actual fraud in the transaction. The plaintiff was represented at the sale by his agent who was authorized to bid for him, but the fact that he was so represented, or that he intended to purchase the property, was unknown to the defendants. In bidding upon it his agent followed his instructions to the letter. Schweitzer was one of the executors by whom the property was sold under a power in the will of their ancestor who died seized of it, and he was therefore virtually a bidder at his own sale. These are facts established by abundant evidence and found by the learned court below. In the light afforded by them this case must be determined.

The plaintiff refuses to comply with the articles of agreement, has notified the bank to withhold payment of his check, and asks that the sale and all proceedings under it be annulled. His principal contention appears to be based on a denial of the facts as found by the court and stated above. To the extent that it is so we overrule it, because the evidence warrants and seems to require the finding of them. So much of his contention as relates to findings requested, and refused, is only another form of attack upon the findings made. The evidence which authorized the latter certainly warranted the refusal of the former.

It is well settled that an executor or administrator may purchase property of the estate at his own sale of it, subject to the power of disaffirmance in the heirs or creditors. If therefore he bids upon it through an agent, in good faith, the other bidders have no right to complain, and there is nothing in his having done so which furnishes ground for setting aside the sale of it to them: Pennock's Appeal, 14 Pa. 446, and Beeson v. Beeson, 9 Pa. 279.

We think the plaintiff has no just cause to complain of the

rulings on which the 21st, 22d, 23d, 24th and 25th specifications are based. Ample latitude was allowed him in the introduction of evidence fairly tending to support his allegation of fraud, but the relevancy of the questions to Schweitzer respecting the amount he intended to bid upon the property and the reasons for his refusal to buy it after the sale for the sum he bid upon it is not clear. These were matters remote from and of but little if any significance in the decision of the issue. Whether the plaintiff when he signed the agreement believed the representations made to him concerning the bidding was a matter for the jury to find, and not for him to state: Thomas & Sons v. Loose, Seaman & Co., 114 Pa. 35, and cases cited.

We agree with the learned court below that there was no agreement to release Schweitzer from any of the conditions of the sale, in the event of his becoming the purchaser of the property. The case appears to have been carefully tried and considered in that court and we discover nothing in the record which calls for a reversal of the decree.

Decree affirmed and appeal dismissed at the cost of the appellant.